Jeffrey A. BRIGGS, M.D.

v.

Gill COCHRAN, Esq.

No. CIV. L–95–3499.

United States District Court, D. Maryland.

Aug. 31, 1998.

Damon K. Bernstein, Rockville, MD, for Plaintiff.

Shirlie Norris Lake, Hamilton Fisk Tyler, Baltimore, MD, for Defendant.

*MEMORANDUM*

LEGG, District Judge.

This is a legal malpractice action brought by Dr. Jeffrey A. Briggs, M.D. ("Briggs"), against his former attorney, Gill Cochran, Esq. ("Cochran").[1] In the fall of 1992, Briggs was a member of a successful OB/ GYN practice in Annapolis, Maryland. On September 13, 1992, a former patient of Briggs's filed a complaint against the doctor with the Maryland Board of Physician Quality Assurance ("BPQA"). The complaint alleged that Briggs manipulated the former patient into having sex with him while she was under his care. Shortly after the filing of the complaint, a second former patient came forward. This second woman added further allegations of sexual and ethical misconduct against Briggs.

Briggs sought Cochran's legal advice. After discussions with BPQA staff, Cochran recommended that Briggs enter therapy, surrender his medical license voluntarily (in order to forestall the filing of formal charges by the BPQA), and attempt to negotiate as short a suspension as possible. Briggs followed Cochran's advice and surrendered his license on November 19, 1992.

Approximately one week later, Briggs discharged Cochran and retained new counsel. Reversing the conciliatory course taken by Cochran, new counsel pursued a more aggressive strategy. The events of the next twenty-four months are complex. In sum, the BPQA filed formal charges against Briggs. Following negotiations with Briggs's attorneys, the BPQA's staff recommended a proposed settlement, under which Briggs's medical license would have been suspended for only nine months. The BPQA rejected the proposal. Briggs left Maryland on June 1, 1993, and practiced medicine in New York for approximately one year. He returned to Maryland when New York, based upon reciprocity with Maryland, suspended Briggs's license.

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. On November 16, 1995, the day the Complaint was filed, Briggs was a citizen of Virginia and Cochran was a citizen of Maryland. Briggs's Complaint prays for $6,000,000 in compensatory and $1,000,000 in punitive damages.

On October 20, 1994, a few months after his return from New York, Briggs signed a Consent Order with the BPQA. Under the terms of the Consent Order, Briggs's Maryland medical license, which he had surrendered on November 19, 1992, became eligible for reinstatement as of November 1, 1994. Briggs's license was eventually reinstated, with conditions, on December 27, 1994.

On November 16, 1995, Briggs filed this legal malpractice action against Cochran. The gravamen of Briggs's claim is that Cochran's investigation was negligible, and his advice incompetent. Had Cochran properly investigated the charges, he would have discovered them to be inaccurate and overblown. According to Briggs, a competent attorney would have contested the charges and negotiated with the BPQA from a position of strength.

Briggs claims that by surrendering his license, he irretrievably lost the opportunity to present his side of the story. Because the doctor surrendered his license at the outset, the BPQA thereafter assumed that the former patients' charges must be accurate. Briggs alleges that had Cochran mounted a vigorous defense, the BPQA would not have suspended Briggs's license.[2]

 Both parties prayed a jury trial. At trial, Briggs would have been required to shoulder the burden of proving that Cochran committed malpractice, and that the malpractice proximately caused the damages alleged.[3] During discovery, Briggs named as an expert Jack Tranter, Esq. ("Tranter"), a highly regarded Baltimore attorney familiar with proceedings before the BPQA. In deposition testimony, Tranter opined that Cochran's investigation and advice were inade-

quate. Tranter, however, was unwilling to testify that Briggs's case would have turned out any differently had Cochran acted properly. In other words, Briggs has offered no expert witness willing to testify that the BPQA would have left Briggs's license intact (or imposed a lesser sanction) had Cochran defended the case differently.

On August 29, 1997, Cochran moved for summary judgment, claiming that without expert testimony Briggs was—as a matter of law—unable to establish causation. In opposing summary judgment, Briggs contended that a jury, unaided by an expert, would be competent to decide the issue of causation. For the reasons set forth below, the Court finds that, without expert testimony to guide it, a jury would be left to speculate as to how the BPQA might have treated Briggs's case had he not surrendered his license. Stated otherwise, without the help of expert testimony the jury would have been left to speculate on the issue of causation. As a result, Briggs's proof on this issue is deficient. Accordingly, the Court, by separate Order, shall grant the defendant's motion for summary judgment.

## Background

After completing his residency at Walter Reed Memorial Hospital in Washington, D.C., in 1984, Briggs served two years at a U.S. army base in Panama. In June of 1986, Briggs and his wife, Mary Joanne, moved to Severna Park, Maryland. Briggs joined an established practice at Annapolis OB/GYN Associates, P.A. ("Annapolis OB/GYN"). In 1988, Briggs became a full equity partner in the practice. In April of 1988, Briggs and his wife decided to separate. In May of that year, Briggs moved into a house in Annapo-

---

**2.** At oral argument, Briggs's counsel clarified his position with respect to causation. Had Cochran organized a proper defense, Briggs's counsel claimed, the BPQA would not have revoked or suspended Briggs's license. This clarification narrowed Briggs's initial claim that proper advice would have led to lesser sanctions (of unspecified nature) than those eventually imposed upon the doctor.

**3.** The damages alleged in Briggs's complaint include: the suspension of his medical license, the loss of his employment and equity position at his practice in Annapolis, the loss of certain medical

privileges in Maryland and elsewhere, damage to his reputation and ability to practice as a gynecologist/obstetrician in the future, exposure to civil liability, emotional distress, fines incurred, plus legal fees and costs.

To establish a claim for legal malpractice against Cochran, Briggs must prove that (1) Cochran was employed as Briggs's attorney; (2) Cochran neglected a reasonable duty owed to Briggs; and (3) such negligence resulted in and was the proximate cause of loss to Briggs. *Cavacos v. Sarwar*, 313 Md. 248, 253, 545 A.2d 46 (1988).

lis, leaving the family residence in Severna Park to his wife and their three children.

In late 1987, Dr. James Rivers, another physician at Annapolis OB/GYN, was temporarily absent from the office. In Rivers's absence, Briggs conducted a routine examination on one of Rivers's patients, who shall be identified as "Mrs. A." The visit revealed that Mrs. A was in need of a laparoscopy. Because Rivers did not perform this procedure, Mrs. A was referred to Briggs again.

On February 4, 1988, Briggs and Mrs. A met in Briggs's office to discuss the laparoscopy. On April 17, 1988, Briggs performed a heart and lung examination in preparation for the procedure. Briggs successfully conducted the laparoscopy two days later, on April 19, 1988. During the following week, Briggs performed an "incision check" on Mrs. A as part of the routine follow-up.

Some time during April, 1988, Briggs and Mrs. A began a personal relationship. Early in the month, Mrs. A called Briggs at his office and asked him to join her and a few friends for drinks. Briggs accepted the invitation. Shortly thereafter, Briggs and his wife decided to separate, and Briggs and Mrs. A began seeing each other regularly. Briggs contends that members of Annapolis OB/GYN were aware of his relationship with Mrs. A but did not object to it.

In October, 1989, Mrs. A, apparently fearing that she was pregnant, arranged to meet Briggs at his office in the evening, after working hours. Briggs performed a sonogram, confirming that Mrs. A was indeed pregnant. Briggs does not dispute that the child was his. In violation of established medical standards, Briggs did not document this procedure. Briggs and Mrs. A agreed that she would abort the child.

Because neither Briggs nor any other doctor at Annapolis OB/GYN performed abortions, Briggs referred Mrs. A to another physician, Dr. Romeo Ferraro, M.D. According to Briggs, Mrs. A was worried that news of the pregnancy would leak out; she was also embarrassed by the prospect of sitting in a waiting room with other women seeking abortions. To spare Mrs. A embarrassment and the risk of exposure, Briggs referred Mrs. A to Dr. Ferraro under the name, "Mrs. Briggs." When Dr. Ferraro successfully aborted the fetus, he did so under the belief that Mrs. A was Briggs's wife. Following the operation, Briggs prescribed post-operative medication.

Two months later, in December, 1989, Mrs. A once again came to Briggs's office after hours. Briggs claims that Mrs. A wished to have an Intra–Uterine Device (IUD) inserted, but did not want to risk exposure or go through the trouble of contacting a different physician. Again, without documenting the procedure, Briggs inserted the IUD.

In the fall of 1990, Briggs was called for active military duty as part of Operation Desert Storm. Briggs was scheduled to depart on November 28, 1990. On the evening before his departure, Mrs. A threw a going-away party for Briggs at her home. The same night, after the party, Mrs. A's former husband committed suicide.[4] When the news reached him, Briggs attempted unsuccessfully to obtain a release from military duty in order to be able to comfort Mrs. A.

Upon his return from active duty in March, 1991, Briggs and Mrs. A were engaged to be married. Soon afterward, however, their relationship deteriorated. In June, 1991, Briggs and Mrs. A broke off their engagement; thereafter they dated only sporadically. Briggs claims that their last date occurred during January or February, 1992. Briggs Aff. ¶ 33.

In April of 1990, a second woman, who shall be identified as Mrs. B, became a patient of Annapolis OB/GYN. Briggs treated Mrs. B several times for complaints of infertility and pelvic pain. According to Briggs, during the early summer of 1991, Mrs. B initiated a personal relationship by calling and leaving notes at Briggs's home. Briggs Aff. ¶ 38.

One evening in July, 1991, Mrs. B arranged to meet Briggs at his house. When Mrs. B arrived, Briggs was not home, but the front door was unlocked, so she let herself in. Hearing the phone ring, Mrs. B answered it.

**4.** Mrs. A and her husband had been married in 1977, and divorced in 1989.

The caller was not Briggs, but Mrs. A. Upon discovering that another woman was seeing Briggs, Mrs. A went to the house. Mrs. B let Mrs. A in, and an argument ensued. Briggs claims that when he returned that evening he found that Mrs. A had broken furnishings and started a fire in the kitchen. Briggs was able to defuse the situation. He sent Mrs. A home and took Mrs. B back to her own house.

Briggs and Mrs. B did not see each other again until December, 1991, or January, 1992, when the doctor performed a routine examination on her in his office. Briggs claims that Mrs. B expressed continued interest in pursuing a personal relationship. The two dated again from February until July, 1992. During this time, Mrs. B complained of menstrual cramping, and Briggs regularly prescribed Tylenol with codeine for her.

In May, 1992, Mrs. A called Briggs to tell him that she was once again pregnant. Mrs. A claimed that the child was his. Briggs denied this, claiming that his relationship with Mrs. A had ended around February, 1992, at the latest, and that Mrs. A had begun dating another man. According to Briggs, Mrs. A insisted that she and Briggs get back together. When Briggs refused, Mrs. A demanded that he pay for an abortion. Briggs again refused. Later, however, Briggs relented when he received a call from Mrs. A's mother, begging for assistance.

On May 24, 1992, at his office after hours, Briggs performed a sonogram and other diagnostic tests on Mrs. A. Briggs claims these tests revealed that the fetus to be non-viable. Although he had never performed such an operation, on May 30, 1992, Briggs aspirated the fetus.[5] Again, Briggs did not document any of these procedures and he did not obtain Mrs. A's express written consent for the aspiration.

In July, 1992, Mrs. B told Briggs that she was pregnant with his child and demanded that he pay for an abortion. Briggs, however, insisted that the child was not his, refused assistance, and told Mrs. B not to contact him again.

On September 13, 1992, Mrs. B filed a complaint against Briggs with the BPQA. Mrs. B's complaint alleged, among other things, that Briggs used his position as a physician to manipulate her into a sexual relationship, abandoned her after she became pregnant, failed to document his medical treatment of her, and improperly prescribed drugs for her for a period of over a year (July, 1991 through August, 1992). Defendant's Suppl. Exh. 4. Shortly after Mrs. B filed her grievance, Mrs. A came forward and joined Mrs. B's complaint.[6] In an October 20, 1992, interview with BPQA Case Manager Nanya Philipsen, Esq., Mrs. A set forth the details of her relationship with the doctor as outlined above.[7] Ms. Philipsen notified

5. Briggs insists that, since the fetus was not viable, this procedure was not technically an abortion.

6. *In August of 1992, Mrs. A and Mrs. B had been in contact again. Mrs. B called Mrs. A to tell her that she was pregnant with Briggs's child. The two women met at a restaurant to discuss what to do. Mrs. A contends that she and Mrs. B were concerned, in part, with preventing Briggs from mistreating other patients. Mrs. A and Mrs. B went to Briggs's house. When they did not find him there, they vandalized his car. Upon discovering the damage, which consisted of scratched paint, punctured tires, a broken mirror and tail-light, Briggs filed criminal charges against the two women. Briggs later dropped the charges.*

7. Mrs. A's account of the relationship differs from Brigg's in many respects. For example, Mrs. A claims that Briggs intentionally and surreptitiously attempted to impregnate her at least twice. Mrs. A alleges that Briggs refused to

accept payment from her for the damage done to his car, but, at least initially, insisted on pressing charges. Mrs. A also submitted to the BPQA the findings of a private investigator she hired to follow Briggs in September of 1992. The investigator allegedly observed the license plate numbers of cars parked outside Briggs's home overnight, and linked those numbers to several then-current patients of Annapolis OB/GYN.

Ms. Philipsen found Mrs. A to be intelligent, articulate, with a good memory, and willing to testify. Defendant's Supplemental Exh. 7, at 7. In an October 22, 1992, Focus Sheet prepared for the BPQA, Philipsen stated, *inter alia*, that Briggs admitted that Mrs. B and Mrs. A were his "girlfriends," and that BPQA staff had "identified the names of four other women and the existence of numerous others who have had recent sexual contact with Dr. Briggs." Defendants' Supplemental Exh. 8. The Focus Sheet also notes that Briggs performed an abortion on Mrs. A after hours without properly documenting it. *Id.*

Briggs of the complaint against him by letter dated October 9, 1992.

On October 26, 1992, Briggs retained Cochran. Briggs informed Cochran of Ms. Philipsen's letter and of his former patients' complaints against him. Cochran referred Briggs to a psychiatrist, Dr. Richard Templeton, M.D., and contacted the BPQA to find out more about the case.[8]

At this point, it is helpful to outline the procedures in Maryland for conducting disciplinary proceedings against physicians. Upon receipt of a complaint, the BPQA is authorized to make a preliminary investigation into the complainant's allegations.[9] Following the preliminary investigation, the Board may, *inter alia,* (i) work out an agreement with the physician concerning corrective action; or (ii) issue formal charges against the physician.[10] Whether or not formal charges have been filed, the BPQA may conduct one or more Case Resolution Conferences ("CRC") to review the case. CRCs take place before a panel of the BPQA. The physician may appear, and be represented by counsel. *Any decision reached by a CRC panel must be approved by the full Board before it can go into effect.*

Before any sanctions are imposed against him, the physician is entitled to a hearing before an Administrative Law Judge ("ALJ").[11] If the BPQA issues formal charges, a State Assistant Attorney General ("AAG") is appointed to prosecute the case on behalf of the Board. The AAG appears as prosecutor at the administrative hearing, while the physician is entitled to be represented by counsel.[12] Following the hearing, the ALJ must issue proposed factual findings for consideration by the BPQA, which may accept, reject, or modify them.[13]

Based on his initial investigation, Cochran came to the opinion that Briggs's best option was to surrender his license voluntarily in order to forestall the issuance of formal charges. In the first weeks of November, 1992, Cochran negotiated with Philipsen concerning the content of the letter of surrender. Philipsen wrote as first draft and sent it to Cochran. It is undisputed that Cochran negotiated a number of concessions, including: (1) the letter contained no mention of Mrs. A's first abortion, or of Briggs's referral of Mrs. A to Dr. Ferraro under a false identity; (2) the term "abortion" was replaced with "procedure" in reference to Briggs's aspiration of the allegedly non-viable fetus; (3) all references to Briggs's failure to document procedures on Mrs. A were omitted; and (4) the letter contained language to the effect that Briggs's voluntary surrender of his medical license was revocable. Defendant's Suppl. Exh. 11; Philipsen Dep. at 72–82.

On November 18, 1995, the BPQA approved the language of Briggs's letter of surrender. On the next day, November 19, 1992, Briggs, Cochran, and Philipsen met in Cochran's office. As he had before, Cochran recommended that Briggs sign the letter of surrender.[14] Briggs signed the letter before a notary public on November 19, 1992.

---

For purposes of the motion for summary judgment, the Court relies on the version of the facts most favorable to Briggs, the non-moving party.

8. There is some dispute over the nature and extent of Cochran's investigations at this stage. In deposition testimony, Cochran claimed that he consulted a number of people, including Briggs's former divorce attorney, concerning the dissolution of the doctor's marriage and to see whether any psychological profiles for the doctor existed; two other attorneys familiar with BPQA proceedings; and Dr. Rivers at Annapolis OB/GYN concerning any prior problems involving Briggs and his patients. Cochran also claimed that he spoke directly with Mrs. A, and that he hired a private investigator to look into Mrs. B's background. Briggs disputes that Cochran took any of these steps and contends that Cochran's investigation was deficient.

9. Md.Code Ann., Health Occ. § 14–401(a).

10. Md.Code Ann., Health Occ. § 14–401(c).

11. Md.Code Ann., Health Occ. § 14–405.

12. Md.Code Ann., Health Occ. §§ 14–405(c) and (d).

13. Md.Code Ann., Health Occ. § 14–405(c).

14. The letter provided, in part, that the surrender was temporary, pending the resolution of Briggs's case. The letter also included Briggs's representation that he did not "possess a license to practice medicine in any other state." Defendant's Suppl. Exh. 11. This representation was inaccurate because, in addition to Maryland, Briggs was also licensed to practice in both Vir-

A few days later, Briggs discharged Cochran and retained Donald DeVries, Esq., and Craig Merkle, Esq., of Goodell, DeVries, Leech and Gray ("Goodell, DeVries"). Briggs's new counsel decided on a more aggressive strategy.

As a first step, the attorneys sought a Case Resolution Conference, where the charges against Briggs could be crystallized and restated. In a mistaken belief that formal charges were a prerequisite to a conference, Merkle, on December 18, 1992, wrote to the office of the Attorney General requesting the appointment of a prosecutor and the issuance of formal charges against Briggs. Defendant's Exh. 12.

Shortly thereafter, Assistant Attorney General Deborah Woodruff was appointed to the case. Woodruff prepared draft formal charges and, on February 4, 1993, sent the draft to Merkle. Defendant's Exh. 13. In the cover letter, Woodruff explained that the draft had not been approved by the BPQA and, therefore, was subject to change. Defendant's Exh. 13.

On February 10, 1993, the BPQA convened a CRC. At the conference, DeVries presented a proposal for Briggs's reinstatement. In deposition testimony, DeVries could not recall the precise terms of this proposal, but Woodruff recommended it to the BPQA panel. DeVries Dep. at 72–73. The panel, however, rejected DeVries's proposal and convened another CRC for April 14, 1993.

Concerned that the first CRC had not been successful, DeVries wrote the BPQA on February 12, 1993, and requested that the issuance of formal charges be postponed. DeVries Dep. at 62. The BPQA, however, denied DeVries's request and filed formal charges against Briggs on February 24, 1993.

Soon afterward, DeVries and Woodruff began hammering out a revised agreement. By April, they drafted a proposal under which Briggs's license would be suspended for a period of one year, retroactive to the date of his voluntary surrender. In addition,

the last three months of Briggs's suspension would be "stayed" in consideration of the doctor's cooperation. DeVries and Woodruff expected that the BPQA would accept this arrangement.

On April 14, 1993, the BPQA held a second CRC. DeVries and Woodruff submitted their joint recommendation for the Board's consideration. At the CRC, DeVries argued that the Board should reward Briggs for admitting his problem, seeking professional help, and voluntarily surrendering his license. DeVries Dep. at 82–83.

The record does not reflect the panel's initial reaction to the proposal. We do know, however, that DeVries and Woodruff drafted a proposed Consent Order along the lines of their agreement. Defendant's Suppl. Exh. 1. The draft recited findings of fact, including Briggs's sexual relationships with Mrs. a and Mrs. B, his referral of Mrs. a under a false name, his after hours performance of "procedures" on Mrs. a, his failure to document such procedures, and his continued treatment of both Mrs. a and Mrs. B during the period of his sexual involvement with them. *Id.* at 2–5. On May 12, 1993, Briggs signed the draft Consent Order, indicating his acknowledgment that the facts stated therein were true.

The signed Consent Order was presented to the BPQA for ratification. On May 26, 1993, however, the BPQA rejected the document by an 11 to 2 vote. Specifically, the BPQA was unwilling to stay the last three months of Briggs's suspension. The BPQA was willing to ratify an amended Consent Order, provided that Briggs's license was suspended for a full year.

The case did not settle at that point. Briggs refused to agree to a year suspension. On June 1, 1993, Briggs discharged Goodell, DeVries. Shortly thereafter, Briggs left Maryland for New York, where, as stated, he also held a medical license.[15] Briggs practiced in New York for approximately one year, until his New York license was revoked

ginia and New York. Briggs claims that he pointed out the inaccuracy to Cochran, but that Cochran advised Briggs to sign the letter anyway. Cochran disputes being informed of the mistake.

15. Briggs obtained his first medical license in New York in 1980, but stopped paying his dues some time thereafter. He renewed his license in 1993 by resuming the payment of dues.

on grounds of reciprocity with Maryland. He returned to Annapolis in July, 1994.

During Briggs's absence from Maryland, the disciplinary process moved forward, albeit slowly. On April 22, 1994, an evidentiary hearing was convened before an Administrative Law Judge ("ALJ"). Briggs, appearing *pro se*, requested a continuance for purposes of seeking another CRC with the BPQA. The ALJ granted Briggs an extension until July 8, 1994.

The BPQA held a third CRC on June 1, 1994. Again appearing *pro se*, Briggs agreed to sign an Interim Consent Order providing for his immediate reinstatement, with conditions.[16] By this time, over one-and-a-half years had passed since Briggs's voluntary surrender on November 19, 1992. Woodruff drafted an Interim Consent Order memorializing these terms, and sent it to Briggs on June 23, 1994. Briggs, however, refused to sign it, offering no explanation for his change of mind. Briggs also failed to appear at the July 8, 1994, administrative hearing, and the ALJ recommended to the BPQA that a default order be entered against Briggs.

In early August, 1994, Briggs retained John Gill, Esq. Gill recommended that Briggs sign an Interim Consent Order virtually identical to the one submitted to Briggs in June, 1994. Briggs followed Gill's advice and signed the document on August, 15, 1994. Defendant's Suppl. Exh. 2. For reasons that remain unclear, the BPQA did not approve the Order.

Briggs signed another, virtually identical Interim Consent Order on October 20, 1994. Defendant's Suppl. Exh. 3. The BPQA approved that Order on November 1, 1994, making Briggs eligible for reinstatement. Briggs soon complied with the necessary conditions, and his license was reinstated on December 27, 1994.

Briggs filed this action on November 16, 1995. In the course of discovery, Briggs produced two expert witnesses: Jack C. Tranter, Esq., and Prof. Arnold Rochvarg.[17] Tranter is a practicing attorney with experience in proceedings before the BPQA. At his deposition, Tranter stated that he was not willing to offer an opinion as to what the BPQA might have done had Cochran handled Briggs's case differently. Tranter Dep. at 75. Similarly, Prof. Rochvarg testified that he was "not prepared" to state what sanction the BPQA might have imposed had Briggs not surrendered his license. Rochvarg Dep. at 168. In short, Briggs has failed to produce any expert testimony to support the causation prong of his malpractice cause of action.

Discussion

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

 In a legal malpractice action under Maryland law, the plaintiff is entitled to have the jury determine both causation and damages. *Pickett, Houlon and Berman v. Haislip,* 73 Md.App. 89, 108–13 (Md.Ct. Spec.App.1987). The question in this case, however, is whether Briggs is required to provide the jury with expert assistance on the subject of the BPQA's decision making processes.

 The precise relationship between expert testimony and the causation prong of a legal malpractice claim has not been addressed directly by the Maryland courts. As a general matter, it is "well established that expert testimony is only required when the

16. The conditions included, *inter alia*, Briggs's agreement (a) to practice under the supervision of a physician approved by the BPQA; (b) to resume psychotherapy sessions with Dr. Templeton or another BPQA-approved psychiatrist; (c) to complete a medical ethics course; and (d) to have a female chaperone present when he examined his patients.

17. On August 29, 1997, Cochran moved the Court in limine to exclude the testimony of Prof. Rochvarg. In response to Cochran's motion, on October 6, 1997, Briggs withdrew Prof. Rochvarg from the list of witnesses for trial. Even if admitted, however, Prof. Rochvarg's testimony would not be sufficient to overcome summary judgment.

subject of the inference is so particularly related to some science or profession that it is beyond the ken of the average layman. Expert testimony is not required, however, on matters of which the jurors would be aware by virtue of common knowledge." *Hartford v. Scarlett Harbor,* 109 Md.App. 217, 257, 674 A.2d 106 (1996), *aff'd* 346 Md. 122, 695 A.2d 153 (1997) (citations omitted).

■ Thus, for example, "[e]xpert testimony is necessary in a legal malpractice case to establish the existence of a breach of a reasonable legal duty, except in that class of cases 'where the common knowledge or experience of laymen is extensive enough to recognize or infer negligence from the facts.'" *Hooper v. Gill,* 79 Md.App. 437, 441, 557 A.2d 1349, 1351 (Md.Ct.Spec.App.1989)(*citing Central Cab Co. v. Clarke,* 259 Md. 542, 551, 270 A.2d 662 (1970)); *Fishow v. Simpson,* 55 Md.App. 312, 318–19, 462 A.2d 540 (Md.Ct. Spec.App.1983).

■ In Maryland, the conduct and discipline of physicians is regulated by the Maryland Medical Practice Act (the "Act"), Md. Code Ann., Health Occ. § 14–101 *et seq.* The Act prohibits a physician from treating as a patient an individual with whom the doctor has carried on a sexual relation.[18] Pursuant to the Act, the BPQA is authorized to discipline physicians who have engaged in unethical practices. Md.Code Ann., Health Occ. § 14–404. The discipline imposed, which can range from a reprimand to the revocation of the physician's license, is a matter within the discretion of the BPQA. *Id.*

The BPQA is a specialized tribunal composed of fifteen individuals, only three of whom are not physicians. Md.Code Ann., Health Occ. § 14–202. Upon appointment, all members of the Board receive an orientation, including training in the Act. Dep. of Dr. Ira N. Brecher, M.D., BPQA Member, at 8. At the time of the events leading up to this dispute, the Board ordinarily met twice a month, each time to conduct three to seven Case Resolution Conferences. Dep. of Frank A. Gunther Jr., Vice–Chairman of the BPQA, at 9.

At such conferences, a panel of the BPQA decides what punishment to impose, if any, for a physician's violations of medical ethics.[19] In reaching its decision, the panel examines the investigative record gathered by BPQA staff. Panel members determine the appropriateness and magnitude of any punishment by relying on a number of factors, including: (1) their experience in dealing with issues of medical practice and the medical profession; (2) their specialized knowledge of medical ethics; and (3) their familiarity with the language and proper interpretation of the Maryland Medical Practice Act. Like any tribunal, the BPQA panel relies heavily upon precedent. In other words, each decision is informed by past decisions in similar cases.

In essence, Briggs has the burden of proving that the BPQA would not have suspended him had Cochran mounted a vigorous defense at the outset. In the best of circumstances, this would be a daunting task. This is not a case in which a more thoroughgoing investigation by Cochran would have absolved Briggs of all misbehavior. Briggs concedes that he was guilty of lapses that, by any definition, must be characterized as serious.[20]

---

**18.** In pertinent part, the statute authorizes the BPQA to discipline any physician who "is guilty of immoral or unprofessional conduct in the practice of medicine." Md.Code Ann., Health Occ. § 14–404(a)(3). In the medical profession, it is understood that having sex with patients constitutes immoral and unprofessional conduct.

**19.** The panels' ruling is subject to ratification by the full Board.

**20.** For example, Briggs admits to having had a lengthy sexual relationship with Mrs. a, who had been a patient of Briggs's medical practice. When Mrs. a became pregnant with his child, Briggs made an undocumented, after hours diagnosis, and referred Mrs. a under a false name to another physician to obtain an abortion. Briggs admits that, after the abortion, he administered post-operative treatment to Mrs. a, and later fitted her for an IUD. In his most serious lapse, Briggs, again after hours and without informed consent, aspirated a second fetus that Mrs. a claimed Briggs had fathered. He did so though he lacked expertise in such procedures, and he covered up by wilfully failing to create the required medical record.

The law requires that a doctor make dispassionate, objective judgments concerning the treatment of his patients. The prohibition against sexual relations between doctor and patient is designed to prevent situations in which personal considerations and entanglements are

The second hurdle for Briggs to overcome is that the BPQA twice rejected proposals negotiated between Ms. Woodruff and Briggs's second set of lawyers. At least one of these proposals would have suspended Briggs's license for nine months. The BPQA voted 11–2 to insist upon a full year's suspension.[21]

These facts present formidable obstacles to Briggs's case. The fatal deficiency, however, is that he offers no expert testimony to the effect that the BPQA, had his case been properly presented, would not have suspended Briggs's license. He offers no evidence that in other, similar cases, the BPQA has left the offending physician's license intact. In short, a verdict for Briggs would require the jury to speculate concerning the deliberations of a specialized board operating in a specialized area. In Maryland, expert testimony is required whenever the subject of the inference before the jury is beyond the ken of an average person. *Hartford,* 109 Md. App. at 257, 674 A.2d 106. The lack of expert testimony on causation is thus fatal to Briggs' claim.

Accordingly the Court, by separate Order, shall grant the defendant's motion for summary judgment.

## Conclusion

For the reasons stated the Court, by separate Order, shall grant the defendant's motion for summary judgment.

---

likely to cloud the physician's objectivity. It is clear that Briggs allowed his desire to cover up the unwanted pregnancies to affect his professional behavior towards Mrs. a. In light of Briggs' misconduct, it would have been remarkable indeed if the BPQA had imposed a sanction lesser than it did.

**21.** Frank A. Gunther Jr., BPQA Vice–Chairman, testified that for sexual misconduct cases the Board routinely considered a one-year suspension to be the minimum imposable sanction. Gunther Dep. at 29.